DECISION AND JUDGMENT ENTRY
{¶ 1} This matter is before the court on appeal of the Wood County Court of Common Pleas, Juvenile Division's February 10, 2005 judgment terminating the parental rights of appellant, Annette D., and awarding permanent custody of her minor child, Samantha D., to the Wood County Department of Job and Family Services ("WCDJFS".) For the following reasons, we affirm the trial court's judgment.
 {¶ 2} Appellant, Annette D., is the natural mother of Samantha D., born August 1989. On August 15, 2001, the WCDJFS filed a complaint alleging that Samantha was a neglected child. The complaint stemmed from concerns regarding the condition of appellant's home. In the trial court's September 21, 2001 judgment entry, journalized on October 1, 2001, Samantha was adjudicated a neglected child; appellant retained custody of Samantha while the WCDJFS was ordered to provide protective supervision and formulate a case plan.
 {¶ 3} On February 5, 2003, temporary custody was awarded to the WCDJFS; a case plan with a reunification goal was developed. The WCDJFS filed a motion for permanent custody on December 3, 2003. A hearing on the motion was ultimately held on January 27, 2005. According to the testimony and evidence presented at the hearing, the original case plan listed three primary goals: Samantha was to obtain an assessment through the Children's Resource Center ("CRC"); Annette was to receive an assessment at Behavioral Connections; and the home was to be maintained as a clean and safe environment. Later, in August 2002, budget counseling for appellant was added to the case plan.
 {¶ 4} According to Tamara O'Brien, a clinical supervisor at CRC, Samantha's assessment was completed in November 2001, and individual counseling commenced. O'Brien testified that Samantha had behavior problems, was verbally and physically aggressive, and had problems in school. Her treatment plan consisted of addressing anger management and conflict at home, and improving school behavior and performance. O'Brien noted that Samantha was on probation at that time.
 {¶ 5} The treatment plan was implemented by in-home support sessions and individual and family counseling in the office. O'Brien testified that the community support services, geared toward the family, did not last for a long period of time due to a lack of a positive response. The focus then turned to Samantha who, approximately six to nine months into treatment, began "partial hospitalization," which is an intensive after-school program two to three times per week.
 {¶ 6} O'Brien testified that the interaction between Samantha and her mother was having a negative impact on her functioning. According to O'Brien, appellant was not providing Samantha with a good model for social behavior. Samantha had difficulties with personal hygiene which impacted her social interactions at school.
 {¶ 7} O'Brien testified that following her removal from appellant's home in January 2003, there was a "major improvement" in Samantha's hygiene and an overall improvement in her functioning at school. Her social skills were still impaired.
 {¶ 8} Rhonda Downard and Tammy Elling, of the Wood County Juvenile Court, were Samantha's probation officers. Downard supervised Samantha from June 2001, until the summer of 2002, when Downard was reassigned. Elling served as Samantha's probationer until she was released from probation in June 2004.
 {¶ 9} Downard testified that because Samantha had transportation difficulties and several cancelled appointments, she began making home visits. Downard states that the majority of Samantha's concerns centered around her behavior at school. Downard believed that Samantha's academic problems were due, in part, to her need for glasses; her social problems were largely due to ill-fitting, dirty and inappropriate clothing and poor hygiene. Samantha was teased on a daily basis and would lash out at her classmates.
 {¶ 10} Concerning her need for glasses, Samantha's school gave her options as to places that would financially assist her in purchasing a pair. The school also kept a "hygiene basket" so she could clean up prior to attending her classes. Downard testified that all of these issues were discussed with appellant "as far as setting a good example" so that Samantha would understand the importance of hygiene and wearing proper clothing to school.
 {¶ 11} Downard testified that while she was Samantha's probationer, she saw little progress. She stated that she was in constant contact with Samantha's school regarding her behavior and her absenteeism, which was largely caused by having untreated head lice. Downard also testified that during a home visit in July, she could smell the stench from the home upon exiting her vehicle. It was a very warm day and Samantha was in a flannel nightgown, there were no sheets on her bed, no clothes in her closet, and no food in the cupboards. The refrigerator housed milk that was yellow in color and over a month old, a blender full of cake mix, and old Chinese food. According to Downard, appellant indicated that she had purchased food the night before; bearing in mind that it was a 90 degree day in July, Downard stated that appellant then went out to her car, opened the trunk, and on top was a package of hot hogs.
 {¶ 12} Downard testified that unlike the typical probation officer assignment, she was working with Samantha and her mother on various issues including housekeeping. Downard testified that any progress that was made eventually reverted back to the prior condition. Overall, Downard believed that in the year that she worked with Samantha, she did not have an appreciable impact on her life.
 {¶ 13} Tammy Elling began working as Samantha's probation officer in June 2002. Initially, the appointments were to be held at the court center twice per month. Due to transportation problems, only one or two appointments were kept that summer and Samantha's behavior issues were the main topic of discussion.
 {¶ 14} At the start of the next school year, Samantha began junior high school and was constantly targeted by her classmates due to her poor hygiene. Samantha responded to the taunting by yelling and screaming at her peers; she was routinely disciplined by school officials. Elling believed that Samantha's hygiene problems stemmed from a lack of parental support and modeling of proper behaviors. Elling addressed these issues with appellant; she seemed receptive and initially followed through with Elling's suggestions. However, the progress was short lived and things reverted back. Elling also indicated that Samantha often failed to take her ADHD medication; this exacerbated her difficulties at school.
 {¶ 15} Elling testified that Samantha was still defiant following her initial placement into a foster home. In her second placement, a treatment home, Samantha's hygiene greatly improved but she was still having problems with her attitude at school and in the home. Nearing the end of her probation, Elling testified that Samantha had made a complete turnaround as to her attitude at school and her grades were improving. Elling attributed the change to "[s]tructure and appropriate role modeling."
 {¶ 16} The family caseworker, Marie Smith, was unable to testify due to a medical condition. Her supervisor, Kelly Hickle, testified on her behalf. Hickle testified that the WCDJFS first became involved with the family due to a report of environmental concerns. At that time, Lucas County still had an ongoing case with the family. In June 2001, the agency received a second report regarding the environmental concerns and, because Lucas County no longer had a pending case, the agency completed an investigation.
 {¶ 17} Regarding the case plan's second goal, appellant's assessment at Behavioral Connections, Hickle testified that the agency had some problems with Behavioral Connections' failure to give a specific recommendation when they felt they did not have the services necessary to meet a client's needs. According to Hickle, Behavioral Connections simply referred her for a psychiatric evaluation; Hickle was uncertain whether this was ever relayed to appellant. Hickle stated that appellant informed the examiner at Behavioral Connections that "they obviously didn't know what they were doing." The caseworker did inform appellant that if she was dissatisfied she could obtain an assessment elsewhere. Hickle had no information regarding any further psychosocial or psychiatric evaluations.
 {¶ 18} Hickle next testified regarding the environmental concerns at appellant's home, the third goal of the case plan. The caseworker had checklists that she went over with appellant; the lists broke down into each room of the home and what tasks needed to be completed in each room. Hickle testified that the agency attempted to make periodic home visits but appellant cancelled many of them or she did not answer the door. Despite these cancellations, there were several visits where the home was observed.
 {¶ 19} Regarding the home visits, Hickle testified that the condition of the home varied. Hickle stated that when the home was in poor condition there were things such as bugs, including cockroaches, throughout the house, expired milk in the refrigerator, moldy food in various rooms, and bags of trash lying around. Hickle stated that appellant never consistently kept the home clean; she had the ability to clean, but not the follow through.
 {¶ 20} Hickle testified that appellant moved to Michigan in July 2003, where she still resides at her mother's house. In August 2004, through the Interstate Compact for the Placement of Children ("ICPC"), a home study was completed through the Michigan social services agency. After looking at the overall condition of the home, the agency would not recommend placement of Samantha there.
 {¶ 21} Ted Hartwell and Jacque Varty, both of the Wood County Health Department, also testified regarding the condition of appellant's home in Wood County. Hartwell testified he first became involved with the home in 2001, and was reengaged in February 2003. Hartwell testified that the condition of the home had come "full circle" in that it seemed as though they were "making progress in keeping the home in fairly neat order and then it had deteriorated back and possibly even to a worse state than it had originally been the first time there." Hartwell agreed that the home had never actually been condemned.
 {¶ 22} Varty testified that on January 31, 2003, he went to the home; the home was cluttered with trash, the refrigerator was dirty with insect feces and food spillage, there were cockroaches in the upstairs rooms, and food particles throughout the house. Varty also believed that the furnace was unsafe and that all the trash around the furnace was a fire hazard. Varty testified that he felt that the home was not safe for a child. Photographs of the condition of the home as well as written reports were admitted into evidence.
 {¶ 23} Kelly Hickle, of the WCDJFS, also testified regarding the final component of the case plan, which was budgeting. Hickle stated because appellant had wide fluctuations in monthly income, she needed to learn how to stretch her money from lucrative months to cover less lucrative months. Hickle stated that the August 2002 case plan amendment changed the budgeting concerns in that appellant was required to attend budget counseling. The WCDJFS never received verification that budget counseling was ever completed.
 {¶ 24} Appellant testified that contrary to the agency's beliefs, she did not blame everything on Samantha and that it was "partially" her fault. Appellant testified that Samantha was very defiant and that she had been at her "wit's end" trying to discipline her. Regarding Samantha's hygiene, appellant stated that she bought Samantha hygiene products and that she would not use them. Samantha also wanted to wear seasonally inappropriate clothing, i.e., shorts in the winter. Appellant felt that Samantha was allowed to dress too provocatively at her foster home and was listening to inappropriate music and watching inappropriate television programs.
 {¶ 25} Appellant admitted that she was not a good housekeeper, but testified that she was keeping her mother's house clean. When asked about the Michigan home study, appellant stated that she knew the agency worker was coming to the home that day. Appellant denied that agency's report that every room was cluttered with "newspapers, phone books, magazines, craft items, [and] Christmas decorations;" she indicated that the clutter was limited to the spare room. Appellant admitted that there was tape holding some of the furniture together, but that her mother kept it because it had belonged to appellant's grandmother.
 {¶ 26} Regarding her financial situation, appellant testified that she earns approximately $300 to $400 per week as an internet psychic. She testified that, even though her mother has her own income, she gives her mother a fair amount of her monthly income to pay the utility bills. Appellant admitted that her past budgetary problems were "partially" her fault because when she had a lucrative month she would lavish it upon Samantha because she "wanted to give her something she didn't have before."
 {¶ 27} Appellant also testified that she had three other biological children which were born in Michigan in 1982, 1984, and 1987. Appellant permanently lost custody of all three children. Appellant stated that Samantha's "my heart," "she's everything to me."
 {¶ 28} On February 10, 2005, the trial court granted the motion for permanent custody and terminated appellant's and any natural father's parental rights.[1] In its decision, the court concluded that awarding the agency permanent custody was in Samantha's best interests due to her improvement in appearance and attitude while in foster care, the length of time she has been in foster care, and her expression to the court that she did not wish to return to her mother's home. The court further found that appellant continuously attempted to blame others, including Samantha, and do the least amount expected of her. The court noted that appellant would "take a positive step forward only to relapse and take two steps back." The court also found relevant that fact that in Michigan appellant had her parental rights involuntarily terminated as to her three other children. Finally, the court stated that although it was not a necessary finding under the procedural facts of the case, it found that Samantha could not be placed with a parent and should not be placed with a parent within a reasonable period of time.[2] This appeal followed.
 {¶ 29} Appellant now raises the following two assignments of error:
 {¶ 30} "Assignment of Error Number One: The trial court erred in determining that appellant mother's parental rights should be terminated, and that the State of Ohio's motion for permanent custody should be granted, pursuant to § 2151.353, § 2151.413 and § 2151.414 of the Ohio Revised Code.
 {¶ 31} "Assignment of Error Number Two: The trial court erred in considering evidence that appellant mother's parental rights to three (3) other children were terminated as a result of legal proceedings in Michigan, and in finding that the child cannot and should not be placed with appellant mother within a reasonable time."
 {¶ 32} Following an agency's reasonable reunification efforts, R.C.2151.413(D)(1) mandates that the agency file a motion requesting permanent custody "if a child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period * * *."
 {¶ 33} Likewise, under R.C. 2151.414(B)(1):
 {¶ 34} "[T]he court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 {¶ 35} "* * *.
 {¶ 36} "(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period * * *."
 {¶ 37} R.C. 2151.414(D) lists the factors that the court shall consider in order to determine the best interests of the child. That section provides:
 {¶ 38} "(D) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 [2151.35.3] or division (C) of section 2151.415[2151.41.5] of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
 {¶ 39} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 40} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 41} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 42} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 43} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
 {¶ 44} As set forth in the above-quoted statutory sections, the trial court's findings must be supported by clear and convincing evidence. The Supreme Court of Ohio has held that clear and convincing evidence is:
 {¶ 45} "* * * that measure or degree of proof which is more than a mere `preponderance of the evidence,' but not to the extent of such certainty as is required `beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cross v. Ledford
(1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 46} In her first assignment of error, appellant contends that the WCDJFS failed to make reasonable efforts to reunify appellant and Samantha. Specifically, appellant contends that the agency failed to timely assess the condition of Samantha's grandmother's home in Michigan and failed to provide counseling options to appellant and Samantha.
 {¶ 47} Upon careful review of the record in this case, we find that appellant's arguments are not persuasive. First, Kelly Hickle of the WCDJFS testified that whenever a out-of-state home study is requested the ICPC is invoked. She stated that the ICPC process is lengthy and that the WCDJFS has had out-of-state home studies take six to seven months to complete. Hickle testified that according to the Michigan agency's documentation, appellant cancelled the home study several times prior to its ultimate completion. Next, regarding the counseling options available to appellant and Samantha, Hickle testified that following appellant's updated assessment by Behavioral Connections, the home-based services that were recommended could not be implemented because Samantha was not in the home. Prior to Samantha's removal, Tamara O'Brien of the CRC testified that individual, in-home, and family counseling services were offered. After approximately six months of in-home or community support services, the service was terminated due to a lack of a positive response. The focus then turned to individual counseling of Samantha. Based on the foregoing, we must conclude that the WCDJFS did not fail to timely assess the Michigan living conditions or provide appropriate counseling services. Finally, as the trial court aptly noted, the consistent thread in this case was appellant's initial positive response to services followed by a reversion back to the starting point. Appellant would also blame others, including Samantha, for things such as the condition of the home.
 {¶ 48} Accordingly, we find that the trial court's decision terminating appellant's parental rights and granting the WCDJFS's motion for permanent custody was supported by clear and convincing evidence. Appellant's first assignment of error is not well-taken.
 {¶ 49} In appellant's second assignment of error, she contends that the trial court erroneously considered, as a "relevant factor," under R.C. 2151.414(E)(16), the fact that appellant's parental rights to three children were involuntarily terminated in Michigan. Appellant further disputes the court's finding that, under R.C. 2151.414(E), Samantha cannot and should not be placed with either parent within a reasonable period of time.
 {¶ 50} With regard to the court's consideration of appellant's prior parental rights terminations in Michigan, appellant argues that the trial court lacked authority to rely on this evidence. In support, appellant cites R.C. 2151.414(E)(11), which permits a court to consider whether the parental rights to a sibling of the child have been terminated under Ohio's statutory framework. Appellant contends that the failure to specifically permit the court's consideration of parental rights terminations in other states precludes such consideration. We disagree.
 {¶ 51} First, the court did not consider the Michigan parental rights termination under R.C. 2151.414(E)(11), the court found it to be a "relevant factor" under the catch-all provision of R.C. 2151.414(E)(16). Next, there were no objections to appellant's own testimony regarding the parental rights terminations. Finally, whether appellant's parental rights were terminated in Ohio or another state does not dictate the relevancy of the termination. Certainly, where parental rights are terminated under Ohio's statutory framework, the court may be certain that specific procedural safeguards were followed; however, this court cannot believe that out-of-state parental rights termination proceedings lack similar safeguards. Thus, such terminations may be considered as a "relevant factor" under R.C. 2151.414(E)(16).
 {¶ 52} For the reasons set forth in our discussion of appellant's first assignment of error, we further find that the trial court did not err in determining that appellant failed to remedy the conditions which caused Samantha to be placed outside the home despite reasonable efforts by the WCDJFS. Thus, the court correctly determined that Samantha cannot and should not be placed with appellant within a reasonable period of time. Appellant's second assignment of error is not well-taken.
 {¶ 53} On consideration whereof, we find that substantial justice was done the party complaining and the judgment of the Wood County Court of Common Pleas, Juvenile Division, is affirmed. Appellant is ordered to pay the costs of this appeal for which sum judgment is rendered against appellant on behalf of Wood County and for which execution is awarded. See App.R. 24.
Judgment Affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Pietrykowski, J. Parish, J. concur.
Singer, P.J., concurs and writes separately.
[1] Samantha's putative father was served by certified mail and notice was made by publication. Her putative father never responded.
[2] This is so, because the WCDJFS filed its motion for permanent custody under R.C. 2151.413(D)(1), and under R.C. 2151.414(B)(1), it would appear that Samantha's best interests were the sole consideration. Regardless, the trial court addressed R.C. 2151.414(E), as is discussed infra.